Good morning, counsel. Are you ready to proceed? Yes. May it please the Court. My name is Lawrence Newers. I'm the attorney for Appellate Sun Pacific Marketing Cooperative. This morning, I would like to focus my argument, unless the Court has any other questions, on the legal issue, which is whether the UCC Section 1308 Reservation of Rights can abrogate a validly entered into contract modification. That is really a case of first impression for this Court or any California appellate court. Could I ask you a factual question before you get started on that? Sure. How long do tomatoes keep between when they're packed and when they need to be shipped, before they rot? Generally, the process is that they're packed, and then they're brought in, and they're ripened. They're picked green, they're ripened to red, and they're shipped three to four days after they are picked. And that is one of the, that really was not an issue in this case, because the issue was packed. And that is really a misunderstanding that the district court had in really where the erroneous findings of fact come from. But if we look at the shipping records and the packing records, and we see more tomatoes being shipped than the packing records reflect were packed in the three to four days before, then doesn't that suggest that the packing records might be erroneous? Because how are they shipping more tomatoes than they packed? Because they can bring them in from the week before. They generally pack them. They usually ship them later. So usually the ---- But you just said three to four days. So if we look at five days, and we see that they're shipping more tomatoes than they packed in the last five days, how are the tomatoes, where are the tomatoes coming from? Well, they're, they could last longer. I'm not to say that they can't. And where in the record does it say they can last longer than five days? It doesn't. That was not an issue. I mean, the decision, again, that's one of the errors we found in this case, is that the judge decided this case on issues that weren't tried, that were never raised by Damari Frush. But your burden, isn't it your burden to show there was a product shortage? Yes, it was. And you relied upon these records. And as my colleague indicated, the records at best are ambiguous. They're not. And under the circumstances, have you met your burden? Yes, we have. Because, remember, the issue of whether there was a product shortage was whether we packed sufficient tomatoes. But whether you actually packed them. And if we think the records of what you packed may be wrong, as the district as the Court looked at them and said, wait a second, there's a problem here with the numbers, and as we look at them, we can see the shipping records and the packing records, and you're shipping more tomatoes than you're packing, at which point we wonder whether you're really packing what the packing records say. But if you look at those, that's why I put the exhibits in there. If you look at the shipped and packed over time, we never ---- You did, though. In a five-day period, you didn't have enough. So if you look at, let's see, October 7th. On October 7th, the ---- What are you looking at? ER blue brief errata at 45. There are a lot more tomatoes being shipped than were packed in the five days before that. They could ---- I mean, it is possible for them to last longer than that. And are you looking at ---- But that's not in the record. And so how do we say that the district court was clearly erroneous in the factual finding, and how do we say you've met your burden when you're saying it's not in the record? Well, first of all, again, they simply said the record ---- the legal standard ---- and this was Damari's argument, that a shortage was if we did not pack sufficient tomatoes. It never went into, and it was not tried, on what happened between when we picked them and when we shipped them. Well, but ---- I mean, that's a whole ---- that's a different issue. However you want to spin it, if you will, the reality is that the ambiguity that we have in this blue brief run at 45 does show that at best there's some ambiguity, perhaps confusion, and since it's your burden of proof for our purposes, don't we have to assume that the district judge was correct, that there was a failure on your part to show a product shortage, which undercuts the rest of what you're about to tell us, at least on that point, right? Well, again, I don't think that's possible, because even if you look at the short period, you've got to look at a little longer period. And in the longer period, there's no ---- How long do you think the period has to be? I mean, it could last 10 days. It's just that sometimes, first of all, you've got to realize, and you have to look at this in its entire context, this was a highly unusual situation where there was a heat wave and South Pacific lost 40 to 60 percent of its crop. And the record shows, I don't even know why we're into this issue, because the record shows that the district court had findings of fact that there was weeks when South Pacific did not pack enough. Damari admitted that. They hadn't fulfilled the contract for five weeks up until this time because they didn't have the product. Well, I've ---- The problem I'm having is that I think the district court may have been a little off on the facts as he found them on the product shortage, and we're focusing upon that. And I'm being sympathetic with the district judge. With all the evidence that was put before him, it was not an easy task. But I think what's bothering me is in the cases like this, when you find them, is you look at who's got the burden of proof. And the issue that we're talking about here is product shortage. And clearly, you have the burden of proof. And I'm just wondering if we're really ever going to find out what the outcome is. And I wanted to call to your attention at page 34 of your brief, your opening brief, where you state the quality that Sun Pacific packs on any day or any given week will never equal the quality it ships. Doesn't that indicate a statement that you can't meet your burden of proof? Well, we can meet the burden of proof because we show in our record show, they show what actually came in the door, what we packed, and we also have the ship records that we ---- that went out the door. Yes. Okay. But what is your ---- what, then, does this statement mean? You say you can, but this Sun Pacific packs on any day or any given week will never equal the quality it ships. You're saying, aren't you saying that this can't be done? Well, because the reason is what the assumption that the district court is making, and this is the erroneous assumption, is that the tomatoes that are packed on a day are going to be shipped on that same day. Quite so. And the district court is having a terrible time with this. Right. But you're saying we'll never know. Well, but that was never at issue. And I'm saying that's why we were prejudiced. Remember, all of these defenses that ---- Product shortage was at issue. That was the issue. Right. But first of all, the case was tried prior to this. It was an issue of what meant product shortage. My client consisted on its belief that a shortage was whether their yields were down. It was DeMari was the one that said if you didn't pack sufficient tomatoes, that was a product shortage. So in the district court, we said, okay, we'll give you your standard, and we can prove that we didn't pack enough tomatoes. Except you then produced records of what you packed that don't match up with what you shipped. So how did you prove that ---- How do we know which ones to rely on? But then look at the ---- look at the ship records. We didn't ship enough. We either had to pack them or we had to ship them. All the ship records shows we didn't ship to DeMari or any other customers. We don't know what you shipped to other customers, do we? Yeah. All the ship records that we have that we submitted in our brief that are in there are the ship records to all customers. Counsel, I grew up in the vegetable producing business. I'm very familiar with PACA and all that. And the concept that shortage is shown by a yield being down is ridiculous. You know that. You can have somebody, now this happens to be a fresh tomato. If you have things, you can put them in a cool warehouse, and they can be sitting there. And then you ship them. I mean, the reality is the yield over time may make a difference. It may affect the quality of the vegetable. But it's not determinative of the issue we have here. Isn't that a fair statement? It's really not. If you go back and you look at it, if you look at the five weeks before. And I mean, the district court did the surmising saying, well, you might have had them stored in the warehouse or something before. And in some vegetables, that may have worked. But the bottom line that we've all said to you is, you know, you can make an argument. There's a certain quantity of vegetables out there. It's affected by yield and so on. But when you have a contract to ship, you have the burden to show that you have an act of God, which is basically what you're claiming. The commercial code treats it differently. But the reality is, that's a big burden. It's a really big burden. You've got to show, my warehouses are clean. I don't have any. I just don't have any. And therefore, we have a problem. You're shipping stuff out and so on, and you're prepared to ship to these folks for more money. Now, we all know that happens in every business, and it happens in the vegetable business as well. That's what PACA and the Department of Agriculture is for, in part. But the reality is, this is your burden. And the problem that I'm having is, with the inconsistencies in the information. But again, there is no inconsistency. Well, I don't read it that way. I read them as being inconsistent, and I read it as being incomplete. So what you're, to me, you're saying, look at this ball. Here's a ball. There's certain things contained in this glass ball. But you're not telling me about the bigger bubble that has other things in it that, and I know, and anybody that's ever done contract law knows, there are other things that must be considered as part of the commercial code consideration. So I've got to help you. I want you to tell me where it is in the record that you can help us with your case. I don't see where you've shown a product shortage based upon what I've seen. What am I missing? Well, you're missing that how can we measure this? There's two objective points we can measure the product that we have. The product that some specific brought in the door, okay, and the product that they have that went out the door. And the evidence is in the record on both of those, our PAC records. And that's just not what we PAC. That shows painstaking detail. We showed what came in from the field, what was picked, what was PAC, what was the ultimate outcome of that. So we have those PAC records. Okay. But in this case, and correct me if I'm wrong, in this case, you've got a situation where instead of their having to cover with somebody else because you don't have the product, suddenly you have them, but at a higher price. No. No, we didn't have them. But you offered to sell them at a higher price. We offered the, remember, the contract modification was to sell limited quantities, what we had, okay, at the market price. And Sun Pacific's right under that contract with an act of God was to cease shipping. That's what the act of God said. It's an unusual act of God clause, but that's what its remedy was.  It said it would exercise that remedy. But instead it said, we will instead offer to sell you the limited quantities we have at market price. You sold every bit, if I'm correct, every bit in terms of quantity of what the original contract called for, right? But what we did is substituted other tomatoes, and this is what the district court got wrong. When they gave the pickup numbers, I want you to look at it a different way. The district court says, well, you gave pickup numbers, and that is a representation of what you had available, that you had them. But what the district court really, what Sun Pacific was saying is that's saying we're going to follow our course of performance that we have followed previously. What we will do is we'll take those orders and we're going to have those. But if we are short the contract tomatoes, what we're going to do is we're going to substitute the other tomatoes. The district court has a finding of fact number 9 that says in the five weeks prior, Sun Pacific shipped more number 1 tomatoes than number 2 on the 6 by 6 size in the contract, and less number 2s. All right? Finding of fact 16, where this is what the entire court's decision is based on, that there's a failure to prove a product shortage. That 16 is predicated on number 2 tomatoes, 6 by 6, and 6 by 7. All right? All Sun Pacific was saying is that we can fill those orders, so we're taking the orders. So if you follow the course of dealing, that's exactly what Sun Pacific did for the five weeks prior to that time. If they did not have the number 2s, they substituted number 1s. Did the contract that you entered into, the cover contract, if you will, specify they were going to be number 2s? Yeah. It said they were going to be number 2s, but a very important thing here. The second contract or the modification of the contract specified number 2s? Yes. Where is that? It says limited quantities, so the quantities stayed the same. But you're saying that, and this is key, that Damari knew there was a shortage. Okay, you're changing the subject on us. Fredlund and I are talking about, you said you were going to sell widgets and you gave them corn poppers or something. We want to be sure that it's the same thing. What did you provide in the cover contract, exactly what you said you were going to do in the original contract? Or was it a different product? It was the same quantities, but in limited what we could produce. So it was the same- No, no, not limited. What about the quality? Were they number 1 or number 2? Yeah, number 1s and number 2s were still in the cover, were still in the second contract. So you gave them exactly the same product as before, is that right? Right. Okay, then where was the shortage? Well, the shortage, no, we didn't because there was not enough number 2s to fulfill the contract. Okay, and so what, so Sun Pacific is being penalized because they were good folks and they took non-contract tomatoes and used them to fulfill the contract. They didn't have to. The district court said that they didn't have to. And he's now basically saying because you substituted, you must have had them. On that happy note, we thank you for your argument, counsel, and we'll hear from the other side.  Good morning. May it please the Court. Stephen McCarron on behalf of DeMari Fresh. There was no proof of shortage. That's the bottom line here. The most pertinent evidence on that is when Sun Pacific declared a shortage, it then went to DeMari and said, but we can supply you the tomatoes, it's just that you're going to have to pay market price. Which, at that point, the market had risen four to five times what had been the price on the contract. It was approximately $5 per box, and then it went up to $21. And that is very strong evidence to show that there was no shortage. Then we have the district court's finding. I want to just be sure in terms of the price. So you're saying they came to your client and said, hey, we're really sorry. We don't have any tomatoes, but we can get them, or we have them, and we'll give them to you for four times the original price? That's right. Did they say we have them or we'll get them? No. I mean, they said that they could supply the contract. I'm not sure. I mean, they're growers. That doesn't necessarily mean they have them. They may have been going out in the market and buying them and servicing you. So that doesn't prove your point, does it? Well, it does, because they wouldn't go out on the market and buy them at $21 and sell them for $21. They're a huge growing operation. They may have a deal someplace where they're getting them for $14 or $15. We don't know. Well, but they have a huge growing operation. I mean, that's what they do. They're growers. They don't go out and buy other product. Maybe they're doing you a favor. They're going to do it just for you. I doubt that. But then we also have the district court's finding that the packing records are not credible based on the fact that they said they could ship it and the packing records show that they didn't have it. The district court had a lot of problems with this case. I mean, I think the your adversary, you have to agree, has pretty well shown the district court was having troubles, and I'm not being critical of the district court. If I'd had this case as a district court judge, I might have had the same problem. But on the pack records, I want to have you respond to this statement made by your adversary in his blue brief at 34. Which where is it again? Oh, the age. Page 34 of the blue brief. Right. It says, the quality, the quantity that Sun Pacific packs on any day or any given week will never equal the quantity it ships. I drew from that that the your adversary is saying it can't be proof by the packs. Well, I'm not really sure what that means. I mean, there's a constant If he's right, it seems to me he's indicating he can't meet his burden of proof, and I wanted to get your view. If the what? I'm sorry. If you take this as accurate, and we're determined about the we're talking about the number of packs, this statement indicates to me that it's impossible to do it with packs, and therefore, it's an admission he can't meet his burden of proof that he has under the contract. Well, that's right. Yeah. I think that's right. Now, I wanted to get your view of whether or not that's an accurate description of what was being said. Well, I He's saying you can't use packs. What else was there to use? Well, that's yeah. There isn't anything. The only thing they can ship is what they packed. That's the bottom line. They have to pack it, and then it's available for shipment. And it can be shipped out the same day or a week or two weeks later. It all depends on the temperature, and there's ethylene in the storage rooms, and that's what determines whether or not they're going to ship it tomorrow or in 10 days, and they're also very geared to the market. They're watching the market all the time, holding back, or if the market's starting to drop, then they get rid of it. I mean, it's very market-driven. What makes this a strain? Is there any other way of your adversary proving this case other than the packs? They could have proven that there was a shortage? Yes. Well, there is no proof of a shortage. They said they had them, and they give them to Damari if he paid the full price. They've already admitted that. They said that. Are you familiar with any case? This is a very unusual cover case. In almost every cover case, you have someone, merchant A, who says, I can't give it to you. I don't have it. I can't get it. And then the buyer of the product goes out into the market, buys something to take the place of it, sues for the difference. That's the traditional cover. Are you familiar with any case, either from our court or any other, even state court, or PAC, I certainly would play there, but anything that would be like this particular case where a grower alleges there's a shortage and then, in effect, agrees to provide its own cover immediately, but at a much, much higher price, four times, apparently? Well, no, because it's a contradiction to say there's a shortage and then say, I can supply it. It doesn't jive. It does seem bizarre to me. I mean, it is certainly — I don't remember ever seeing anything quite like this in this setting. My colleague has raised the point that they could have gone out and bought and so on. But, of course, what advantage, unless they were being duplicitous of this, but that would — is there any evidence that they bought the product from anybody else? No. They didn't put that on? There's zero — there's no evidence that they bought it. And when they came to your client and said, gee, we're really sorry, we have a shortage, but offered to provide it to you, did they say they would get it from anybody else, or they said they would provide it themselves to their own? Well, they just said they could provide it. They didn't say they were going to get it from somebody else. But there's no evidence whatsoever that they bought this product from anybody else. Okay. So for purposes of the burden of proof, that kind of goes to the product shortage issue, does it not? Where they — they said there's a product shortage. They say they will provide for you. They don't say where they're going to get it. But by the same token, they don't say, we'll go out on the market and we'll buy it and we'll do it for you. They just say, we will provide it at four times the original price. That's right. That's right. Yes. And your client had the obligation at that point, though, to explicitly reserve its rights, correct? Yes. And I think, as Judge Ishii found, they did. I mean, it was clear there was a protest, that they thought this was unfair, and there was going to be — there's a dispute, and it would have to be resolved, in this case, he said, by PACA, which is the PACA agency that does these kinds of disputes. And, in fact, there was an administrative hearing before PACA in which that PACA agency decided that they — that Sun Pacific had not proved a shortage, said that there were five times the amount of the product that — that Sun Pacific had that produced that year, more than — five times more than what was due under the contract. And then that was — that was appealed to the district court and then consolidated with Sun Pacific's case, in which they sued Dimari for not paying the market price. The — the letter from Locato to Jilardi on September 1st, 2006, that's at ER-108. It says, I need a letter from Sun Pacific stating the reason and duration for calling the act of God and an understanding of when it will start again. Tom, please send me a letter from Sun Pacific stating your reason for calling the act of God and your assurance that once conditions are normal or close to normal, you will resume the contract. Is that an express reservation of rights? Waxman. Well, I — I think the reservation of rights really came at the time when Sun Pacific said, we will sell you the product. We'll — we'll supply the product, but only at market price. Now, keep in mind, at — at this point — Well, isn't that what he was responding to in that letter, that statement? That — When he says, I need a letter explaining this, isn't that responding to his offer to provide the tomatoes at market price? No, no. That letter came earlier, I think. What he wanted to know was, you know, he wanted some — some basic reasons why they're calling this — this shortage. And then later, I believe, that's when they offered the — the sale at the market price, and that's when Locato said, I disagree. According to the findings of the district court, the district court found that — that at that point, Locato said, you know, I disagree with this. We have a dispute, and we have to go to PACA on this. I — I — I don't know where — You used the testimony for that? Where is that in the record? I think it's basically the district court's finding based on the testimony of the witnesses. He credited that testimony from Locato, specifically in the findings of fact. Is it fair to say that in the vegetable industry in general, these things happen pretty quickly? A lot of it's word of mouth, short things here and there. I don't know what it is in the era of Internet, but these are — you don't get lawyer letters back and forth on these kinds of things very often, do you? No, not really. I mean, they try to work it out themselves as quickly as possible. And — but eventually, you know, the law — here we are, the lawyers get involved. And — and the commercial code is pretty broad in allowing someone to protest. Language doesn't have to be expressed. It can be, say, with reservations or, you know, we — we object or continuing objection, something like that. That's enough, isn't it? Just one time. I think so. I think so. That's what the judge found and — and — and explained it pretty well in his decision. Okay. Do you have any — Any other questions? All right. Thank you. Thank you both. We appreciate it. The case just argued is submitted.
judges: Wallace, Smith, Friedland